# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 18-0490V
### Filed: April 8, 2019
UNPUBLISHED

|  |  |
|---|---|
| ANDRU GARRETT,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Jeffrey T. Sprague, U.S. Department of Justice, Washington, DC, for respondent*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On April 3, 2018, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that he suffered left shoulder injuries caused in fact by the influenza vaccination he received on November 19, 2016. Petition at 1, ¶¶ 2, 9 (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters.

On July 31, 2018, the undersigned issued a ruling on entitlement, finding petitioner entitled to compensation for his shoulder injury related to vaccine administration ("SIRVA"). (ECF No. 12). Being previously informed that the parties had

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

been unable to agree upon an appropriate amount of compensation in this case, the undersigned ordered the parties to file simultaneous briefs regarding the damages to be awarded.  (ECF No. 19).  For the reasons described below, the undersigned finds that petitioner is entitled to an award of damages in the amount of **$70,000.00, representing compensation for actual pain and suffering.**

## I.      Relevant Procedural History

With his petition, petitioner filed some of the medical records needed to establish the merits of his case. *See* Exhibits 1-5 (ECF No. 1).  Following the initial status conference, he was ordered to file medical records from treatment received prior to vaccination at Mercy Children's Hospital & Clinics ("Mercy Children's") in Kansas City, Missouri.  *See* Order, issued May 31, 2018, at 1 (ECF No. 8) (initially only records from the day after vaccination were requested).  Petitioner filed the additional medical records on July 30, 2018.  *See* Exhibit 6 (ECF No. 9).

On July 31, 2018, respondent filed his Rule 4(c) report, conceding that petitioner is entitled to compensation.  (ECF No. 10).  Specifically, respondent agreed petitioner's injury meets the requirements for SIRVA as defined on the Vaccine Injury Table.  *Id.* at 3-4; *see* 42 C.F.R. § 100.3(a)(XIV) (Table SIRVA after influenza vaccination); 42 C.F.R. § 100.3(c)(10) (Qualifications and Aids to Interpretation for SIRVA).  The same day, the undersigned issued a ruling on entitlement, finding petitioner entitled to compensation. (ECF No. 11).  She instructed the parties to engage in informal discussions regarding the appropriate amount of damages in this case.  Damages Order, issued July 31, 2018 (ECF No. 12).

During the subsequent two months, petitioner submitted a demand and supporting documentation to respondent, and respondent provided a response to petitioner's demand.  *See* Status Reports, filed Aug. 30 and Oct. 1, 2018 (ECF Nos. 14, 16).  On October 10, 2018, respondent's counsel emailed the OSM staff attorney managing this SPU case,[3] informing her that the parties had reached an impasse regarding damages and that respondent believed a damages hearing was needed.  *See* Informal Remark, dated Oct. 10, 2018.  A call with the staff attorney was held on October 24, 2018.

During the call, the parties agreed to submit briefing on the issue of damages and to ask the undersigned to issue a written decision awarding damages.  *See* Order, issued Oct. 26, 2018, at 1 (ECF 19).  Respondent's counsel qualified respondent's agreement by requesting that, in addition to a brief on the issue, petitioner file the damages statement that he submitted with his demand.  *Id.* at 2.  Petitioner's counsel agreed to the request, noting that she would need to obtain confirmation from her client. *Id.* at 1-2.  The parties completed their filings in December 2018.  (ECF Nos. 21-23). Neither party filed a response.  The matter is now ripe for adjudication.

---

[3] Petitioner's counsel was copied on the correspondence.

## II.     Relevant Medical History

Petitioner was 16 years old and a junior in high school when he received the influenza vaccination administered on November 19, 2016.[4]  He filed medical records from his primary care provider ("PCP"), Dr. Weldon Harris, from as far back as December 2009, shortly before he turned ten years old.  *See* Exhibit 4 at 39 (Dec. 3, 2009 visit).

These earlier records show that petitioner suffered typical childhood illnesses and several sports injuries.  Exhibit 4 at 15-48.  For example, from early December 2009 through early 2013, while playing football, he suffered injuries to his left heel (*id.* at 39, indicating pain) and right arm (*id.* at 22, indicating pain and tingling).  When seen for his right arm injury, on January 23, 2013, Dr. Harris noted that petitioner also experienced continued right knee pain which had started in 2011.  *Id.* at 22.  Petitioner attended physical therapy ("PT") at Centerpoint Medical Center ("Centerpoint") for his right knee pain from late November 2013 through February 2014.  Exhibit 3 at 2-33.  On February 25 and October 2, 2015, while playing basketball, he sustained injuries to his "bottom" (Exhibit 4 at 18) and left knee (*id.* at 15), respectively.  In July 2014, he was reported to have mild asthma.  *Id.* at 17.

In the year before he received the influenza vaccination, petitioner suffered from several injuries while playing basketball.  On February 9, 2016, he was seen by Dr. Harris, for an injury to his right hip and toe.  Exhibit 4 at 14.  Later records indicate he slipped while playing basketball.  Exhibit 6 at 9.  Although he didn't fall, he "felt like he could have pulled something."  *Id.*  Approximately one month later, he visited the emergency department ("ED") at Mercy Children's in the evening of March 14, 2016.  *Id.* at 5-48.  He reported that his pain initially had improved under the care of a chiropractor, but his injury was aggravated when he decided to participate in track.  At the March ER visit, he was observed to have difficulty walking.  *Id.* at 9.  After x-rays and an orthopedic assessment, he was discharged with crutches, pain medication, and instructions to cease all physical activity, including sports, until he followed-up with orthopedics.  *Id.* at 12.

Petitioner was seen at the orthopedic clinic at Mercy Children's twice in April and May 2016 (Exhibit 6 at 55-73) and attended PT at Centerpoint from late April through late June 2016 (Exhibit 3 at 34-3, 46-60).  At the second orthopedic appointment, it was noted that petitioner had been discharged from PT, with instructions to return to full activity within a few weeks.  Exhibit 6 at 66.  In late April 2016, petitioner was hit on the nose while playing basketball.  *See* Exhibit 6 at 80 (visit to ED department); Exhibit 3 at 38-44 (PT records).  Additionally, he was seen at the ED at Mercy Children's for lower back pain in June 2016.  Exhibit 6 at 383-386.

On November 16, 2016, petitioner had a walk-in appointment with Dr. Harris for fever, chills, and a headache.  Exhibit 4 at 54.  He was told to rest and drink plenty of fluids.  *Id.* at 55.  Early the next morning, he presented to the ED at Saint Luke's East

---

[4] Although 16 years old at the time of vaccination, petitioner was 18 years old when he filed this petition.

Hospital with abdominal pain, fever, and vomiting.  Exhibit 6 at 394.[5]  He was diagnosed with pneumonia and sepsis and transferred to Mercy Children's for inpatient care.  *Id.* at 374-78.  After transfer, he was quickly moved to the Pediatric Intensive Care Unit ("PICU").  While in the hospital, he missed several school events, an important basketball game, team photo, and choral concert.  *Id.* at 260.  His mother reported that he had made the varsity basketball team for the first time that year.  *Id.*  He received the influenza vaccination, while in the hospital, intramuscularly in his left deltoid on November 19, 2016.  Exhibit 1 at 2 (vaccine record).  Petitioner was discharged from Mercy Children's on November 20, 2016.  Exhibit 6 at 207-224.

During a follow-up visit with his Dr. Harris on November 23, 2016, some residual pneumonia was observed in petitioner's lower left lobe.  Exhibit 4 at 60.  He was instructed to rest for two weeks and to drink plenty of fluids.  *Id.*  Three days later, on November 26, 2016, petitioner visited the ED at Mercy Children's with pain on the left side of his chest and back.  Exhibit 2 at 137.  He described his level of pain as 3 on a scale of 10, adding that it was worsening.  *Id.*  Informed that the pain was, most likely, due to his cough and pneumonia, petitioner was instructed to take ibuprofen and to follow-up with his PCP, Dr. Harris.  *Id.* at 142.  Petitioner was seen by Dr. Harris on December 1, 2016.  In the record from this visit, it was noted that he was attending school, had finished with his antibiotics, and wished to return to basketball.  *Id.* at 63.

Petitioner was first seen for his left shoulder pain at the Urgent Care Clinic ("UCC")[6] at Mercy Children's on December 7, 2016.  He reported that the nurse had administered the vaccination high on his shoulder and he had experienced pain since that time.  Exhibit 2 at 121-22.  Although his pain was described as "tender" (*id.* at 120), petitioner indicated that he felt it "deep down in the shoulder (*id.* at 126 (noted as a direct quote from petitioner)).  He estimated his pain to be 3 out of 10, adding that it "was worse after he stopped taking ibuprofen" as prescribed for his previous left side and back pain.  *Id.* at 122.  He stated that his pain "has been getting worse to the point where he can no longer move his arm."  *Id.*  His mother mentioned that she was concerned that he was suffering from a SIRVA.  *Id.*  Upon examination, petitioner was observed to have "decreased [range of motion ("ROM")] with extension and abduction of left shoulder due to pain."  *Id.* at 123.  X-rays were ordered, Naproxen prescribed, and a referral to sports medicine was provided.  *Id.*; *see id.* at 133 (results of x-rays).  The next day, on December 8, 2016, Kim Marilyn, RN, spoke to either petitioner or one of his parents who indicated his condition had improved.  *Id.* at 132.

Petitioner was seen at the orthopedic clinic at Mercy Children's on January 13, 2017, by Dr. Margaret Gibson.  Exhibit 2 at 113.[7]  At this visit, petitioner reported that he

---

[5] Some of the medical records from petitioner's November 2016 hospitalization at Mercy Children's can be found in Exhibit 1.  Since Exhibit 6 contains the more comprehensive set of these records, when the medical record appears in both exhibits, citation will be to the copy contained in Exhibit 6.

[6] The medical records from other visits to the ED department at Mercy Children's contain a combination of notations indicating both "ED" and "ED/UCC" assessments, but all notations in this record are to "ED/UCC."  Additionally, a later record specifically states that petitioner visited UCC.  Exhibit 2 at 113.  Thus, the undersigned presumes petitioner went directly to the UCC for this visit.

[7] The later medical records from Mercy Children's can be found in Exhibit 2.

was playing basketball but that his pain was worse, especially when lifting his arm. He added that Tylenol helped and that "he can still do everything, but it does hurt." *Id.* at 113. He described his pain as sharp, stabbing, and aggravated by movement. *Id.* at 113, 116. While being examined, he showed full ROM with pain at the top of the arc and strength decreased by 50%. *Id.* at 114. Indicating petitioner had a weak rotator cuff and may have some inflammation of his bursa, Dr. Gibson ordered an MRI and instructed petitioner to begin a home exercise program. Due to a greater risk of further injury, she recommended that petitioner not play basketball until his condition improved. *Id.* at 115. The MRI, performed on January 24, 2017, showed a possible partial tear and tendinosis of the rotator cuff and a small amount of fluid in the subacromial bursa indicating bursitis. *Id.* at 110.

A day after undergoing the MRI, petitioner was seen for an injury[8] to his right thumb sustained while playing basketball. Exhibit 2 at 100. He estimated that his level of pain was 5 out of 10. *Id.* at 101. X-rays revealed no fracture or dislocation, and petitioner was instructed to return to physical activity when able. *Id.* at 104.

On February 13, 2017, petitioner visited the ED at Mercy Children's with a cough, difficulty breathing, and chest pain. Exhibit 2 at 87. His November 2016 illness and corresponding hospital stay was noted. *Id.* at 85. Petitioner indicated that "he frequently experiences cough and breathing difficulties as well as chest discomfort prior to and while performing physical activity [and that] [a]lthough never formally diagnosed with asthma, he has routinely used albuterol prior to participating in sports." *Id.* at 88. Petitioner was prescribed Flovent[9] and instructed to follow-up with his PCP for further evaluation. *Id.* at 87. There is no mention of shoulder pain in the record from this visit, and it is noted that petitioner had "Normal ROM." *Id.* at 88.

On March 7, 2017, petitioner began PT for his shoulder injury at Centerpoint. Exhibit 3 at 63 (listing Dr. Gibson as the referring physician). At the initial evaluation, petitioner reported that, after receiving the influenza vaccination, he "had soreness that never went away." He added that Dr. Gibson had diagnosed him with bursitis, and that his MRI "revealed some fluid in his bursa sac." *Id.* Although petitioner reported that "his arm had been feeling a lot better over the past 2 weeks," he indicated his left arm "[wa]s now much weaker than his right." *Id.* He clarified that "he doesn't necessarily have pain when he lifts things but has pain immediately after." *Id.* Upon examination, it was noted that petitioner had pain levels of 0 out of 10 at rest and 4 out of 10 with activity. *Id.* at 64. Petitioner exhibited normal ROM but showed some weakness (4/5) in his left shoulder.[10] *Id.* Diagnosed with "left shoulder subacromial bursitis and infraspinatus tendinosis," petitioner was described as "in the subacute phase of healing." *Id.* His injury was reported to be "moderately severe and moderately irritable." *Id.* Two to three sessions

---

[8] Petitioner's "[r]ight thumb got jammed into the basketball backboard around 4PM." Exhibit 2 at 102.

[9] Flovent "is a prescription inhaled corticosteroid medicine for the long-term treatment of asthma in people aged 4 years and older." https://www.flovent.com (last visited Mar. 25, 2019).

[10] Except for a slight decrease in strength during external rotation, petitioner's right shoulder strength was assessed as 5/5. Exhibit 3 at 64.

of PT per week for four to six weeks was recommended.  *Id.* at 65.  Petitioner reported pain levels of 3 prior to and after this first PT session.  *Id.* at 72.

In March through early April 2017, petitioner attended three more PT sessions, on March 21, 28 and April 4) and was noted to be a "No show" on two occasions (March 24 and 30).  Exhibit 3 at 66-71.  During the first two sessions, he exhibited some slight progress.  At the first session, on March 21, 2017, petitioner indicated that he had performed his exercises while in New York and described his arm strength as improving.  However, he reported that he continued to have pain after performing his exercises.  *Id.* at 70.  During the session, he was able to perform some, but not all, of the exercises.  Petitioner described his pain level as 3 prior to the session and 2 afterwards.  *Id.* at 70-71.   At the March 28 session, petitioner again reported improved arm strength but continued pain with activity.  *Id.* at 68.  He indicated that he had experienced pain during the weekend while helping his mother "move stuff."  *Id.* Experiencing sharp pain with one exercise, he described pain levels of 0 prior to the session and 3 afterwards.  *Id.* at 68-69.

By the next session, on April 4, 2017, petitioner appears to have experienced a slight relapse.  He reported some shoulder pain and neck soreness.  Although he had played basketball the previous day, petitioner indicated this "doesn't usually hurt him." Exhibit 3 at 85.  He attributed his neck soreness to sleeping wrong.  *Id.*  After the session, it was recorded that he had "[s]hakiness" and "[s]ignifcant scapular winging." *Id.* at 86.  He reported pain levels of 3 prior to the session and 5 afterwards.  *Id.* at 85.

Petitioner was re-evaluated on April 6, 2017.  At that PT visit, he reported "an 'irritation'" after his last PT session which he described as "muscle soreness."  Exhibit at 87.  He estimated his current level of pain to be 2 out of 10.  *Id.*  Upon examination, he exhibited the same levels of strength as he did on March 7, 2017, and his pain was noted to be 0 at rest and 5 with activity.  *Id.* at 87-88.  Under the observations section, it was noted that petitioner "continues to have pain but reports it [to be] better overall."  *Id.* at 88.  His strength was better, but it was noted that "he continues to have significant strength deficits as seen through had held dynamometer[11] testing today."  *Id.* Additional PT was recommended.  *Id.* at 88-89.  The treatment note for that visit lists his pain level as 2 before the session and 5 afterwards.  *Id.* at 83.

On April 13, 2017, petitioner exhibited weakness and indicated he was still sore from his last session.  Exhibit 3 at 81.  At the beginning of the session, he reported pain at a level of 4.  However, after the session, petitioner's pain levels were listed as a consistent 3 before and after the session.  *Id.*  Under the comments section, the physical therapist recorded that petitioner "[d]emonstrated poor endurance with exercise, requiring rest breaks."  *Id.*

During the remaining six PT sessions, from April 20 through May 19, 2017, petitioner continued to make slow but consistent progress.  For example, on both April 20 and 25, he was able to lift his mother's photo booth without pain.  Exhibit 3 at 79, 77.

---

[11] A dynamometer is an instrument for measuring the force of muscular contractions.  Dorland's Illustrated Medical Dictionary at 575 (32th ed. 2012).

At the April 20 session, he reported that he had sprained his ankle playing basketball[12] but noted that his shoulder pain was "a little better." Exhibit 3 at 79. After the three April sessions, he described his pain prior to the session as 1 or lower and 2 or lower afterwards. *Id.* at 96, 95, 93 (in chronological order). During two of the three PT sessions in May 2017, petitioner indicated his pain levels were 0 both before and after the session. *Id.* at 93, 96. At the other session, both levels were noted to be 1 out of 10. *Id.* at 95. At his last PT session on May 19, 2017, petitioner reported no pain for a week or two. *Id.* at 93.

Petitioner was discharged from PT on June 23, 2017. The discharge summary indicates petitioner's "mother called and said he was doing well and requested discharge from physical therapy." Exhibit 3 at 98. Thus, it appears petitioner did not attend PT on June 23, 2017. Additional notations in the discharge summary support this finding. For example, under goals, it is noted that they were "not assessed secondary to patient not returning to physical therapy." *Id.* at 99. Additionally, the section titled "Visit Information" lists 12 sessions attended and 3 missed appointments. *Id.* Since the other records describe 12 sessions attended and 2 missed sessions, it follows that the June 23, 2017 session was the third missed session. Thus, according to the medical records filed, the May 19, 2017 PT session was the last time petitioner was treated for his shoulder injury.

In November and December 2017, petitioner visited the ED at Mercy Children's on three occasions for left side pain, congestion, and shortness of breath. Exhibit 2 at 55, 39, 27 (in chronological order). Petitioner was administered an exercise stress test on January 12, 2018. Exhibit 2 at 10.

## III.     Petitioner's Damages Statement

On April 3, 2018, petitioner filed the basic affidavit required by § 11(c)(1). Exhibit 5 (ECF No. 1-8). He filed a more detailed damages statement on December 16, 2018, but this statement is not signed or notarized. *See* Exhibit 7 (ECF No. 9-1).

In his statement, petitioner indicates that he received the influenza vaccination when being released from the hospital after suffering pneumonia and sepsis. Exhibit 7.[13] He further indicates that he nearly died during his illness and describes the event as "the most traumatic event in [his] life." *Id.* Because his shoulder injury occurred immediately after his hospitalization, he argues its timing intensified the impact of the injury. *Id.*

Petitioner describes his pain level as an 8 out of 10 while at rest and 10 out of 10 with movement for months after vaccination. He asserts that, within a week of vaccination, his arm hurt so much that he "couldn't even lift it." Exhibit 7. Despite being included on the varsity roster and having previously practiced with the varsity team,

---

[12] He visited the UCC at Mercy Children's for treatment of his sprained ankle on April 15, 2016. Exhibit 2 at 66.

[13] The unsigned damages statement, filed as Exhibit 7 is a typed document, one page in length.

petitioner was forced to spend most of the season on the bench. Petitioner attributes his inability to play basketball his junior year to his earlier illness (sepsis and pneumonia) and left shoulder injury. He indicates that his pain levels and ROM improved with PT, but not until the basketball season was finished. Petitioner maintains sitting on the bench during most of the season "really was the hardest time of [his] life." *Id.*

According to petitioner, these pain levels, 8 to 10 out of 10, continued through the first months of his senior year. Exhibit 7. During basketball practice sessions in August and September 2017, he states that he was forced to tape his arm. By the start of the season in October 2017, petitioner indicates his pain had improved to a level of 6 to 7 out of 10, but he alleges that he continued to experience pain through March 2018, when running track and pumping his arms. *Id.*

## IV.   The Parties' Arguments

Petitioner seeks damages in the amount of $95,000.00 for his actual pain and suffering. Petitioner's Brief in Support of Damages ("Pet. Brief") at 6 (ECF No. 22). Specifically, he asserts that his inability to play basketball "and the resultant emotional impact it had on him" support an award in this amount. *Id.* He compares the facts in his case to those in three other decisions, *Desrosier, Dhanoa, and Marino*[14] in which amounts from $75,000.00 to $85,000.00 was awarded for actual pain and suffering. Pet. Brief at 4-6. Citing the statistical data found in the *Kim,*[15] petitioner notes that the median amount of damages awarded in proffered[16] SIRVA cases is $100,000.00. Pet. Brief at 4. When providing the details regarding his pain and suffering, petitioner relies heavily on the information provided in his unsigned damages statement. *Id.* at 6-7.

Respondent argues that petitioner should be awarded $50,000.00 as compensation for his actual pain and suffering. Respondent's Brief on Damages ("Res. Brief") at 1 (ECF No. 21). He maintains that "[p]etitioner's SIRVA was mild and the evidence of record indicates a good recovery." *Id.* at 12. Comparing petitioner's facts to those in *Desrosier* and *Marino*, respondent asserts "that the severity shown by

---

[14] *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.15 in past unreimbursable medical expenses); *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses).

[15] *Kim v. Sec'y Health & Human Servs.*, No. 17-418V, 2018 WL 3991022, at *6 (Fed. Cl. Spec. Mstr. July 20, 2018).

[16] If, based on a concession by respondent or ruling by the special master, entitlement has been determined in favor of petitioner, a case is said to be "in damages." As such, the petitioner in that case is entitled to the full amount of damages appropriate under the Vaccine Act. If the parties reach an agreement regarding the amount to be awarded, respondent generally will file a proffer setting forth the agreed upon amount and any designated subtotals. Thus, the amounts awarded in proffered SIRVA cases represent amounts agreed upon by the parties as reflecting the full amount of compensation appropriate under the Vaccine Act.

petitioner in the current case does not reach the level described" in those cases.  *Id.*
Instead, he compares petitioner's injury to the one suffered by the petitioner in another
case in which $60,000.00 was awarded for actual pain and suffering, *Knauss*,[17] claiming
petitioner's injury "was less severe than what existed in *Knauss*."  Res. Brief at 14.

## V.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual
and projected pain and suffering and emotional distress from the vaccine-related injury,
an award not to exceed $250,000."  § 15(a)(4).  Additionally, petitioner may recover
"actual unreimbursable expenses incurred before the date of judgment award such
expenses which (i) resulted from the vaccine-related injury for which petitioner seeks
compensation, (ii) were incurred by or on behalf of the person who suffered such injury,
and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined
to be reasonably necessary."  § 15(a)(1)(B).  Petitioner bears the burden of proof with
respect to each element of compensation requested.  *Brewer v. Sec'y of Health &
Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18,
1996).

There is no formula for assigning a monetary value to a person's pain and
suffering and emotional distress.  *I.D. v. Sec'y of Health & Human Servs.*, No. 04-
1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for
emotional distress are inherently subjective and cannot be determined by using a
mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V,
1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain
and suffering is inherently a subjective evaluation").  Factors to be considered when
determining an award for pain and suffering include: 1) awareness of the injury; 2)
severity of the injury; and 3) duration of the suffering.[18]  *I.D.*, 2013 WL 2448125, at *9
(quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030,
at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70
F.3d 1240 (Fed. Cir. 1995)).

The undersigned may also look to prior pain and suffering awards to aid in her
resolution of the appropriate amount of compensation for pain and suffering in this case.
*See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009)
(finding that "there is nothing improper in the chief special master's decision to refer to
damages for pain and suffering awarded in other cases as an aid in determining the
proper amount of damages in this case.").  And, of course, the undersigned may also

---

[17] *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May
23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical
expenses).

[18] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times
petitioner was a competent adult with no impairments that would impact her awareness of her injury.
Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's
injury.

rely on her own experience adjudicating similar claims.[19]   *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).   Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.   *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

## VI.    Analysis

### A.  Petitioner's Level of Pain and Suffering

The medical records in this case establish that petitioner suffered a moderately severe SIRVA injury for approximately six months with mild to moderate pain, particularly with movement, and significantly decreased strength.   Other than petitioner's allegations as stated in his brief and unsigned damages statement, there is no evidence to support his assertion that he continued to suffer severe levels of pain beyond May 2017.   *E.g.*, *id.* at 96.   Although he now describes his left shoulder injury as more severe, both in the levels of pain suffered and duration, these allegations are not supported in the medical records filed.   As previously held by the Federal Circuit, it is appropriate for a special master to give greater weight to evidence contained in medical records created closer in time to the vaccination, even if the information is provided as part of a medical history.   *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (medical records are generally trustworthy evidence).

In the medical records, petitioner often described his left shoulder pain as sharp, stabbing pain which worsened with movement.   *E.g.,* Exhibit 2 at 113, 116 (visit to orthopedist, Dr. Gibson).   The MRI conducted on January 24, 2017, showed a possible partial tear and tendinosis of the rotator cuff and a small amount of fluid in the subacromial bursa indicating bursitis.   *Id.* at 110.   However, petitioner rated his level of pain as mild, usually 3 out of 10 or less.   *E.g.*, *id.* at 122 (Dec. 7, 2016 UCC visit).   Petitioner noted pain with movement at a level of 5 out of 10 on only two occasions, in early April 2017.   Exhibit 3 at 85, 87.   Moreover, petitioner's pain at rest was often described as mild or non-existent.   *E.g., id.* at 87.   Thus, petitioner's pain levels, as shown in the contemporaneously created medical records, were mild to moderate.

In his brief and unsigned statement, petitioner paints a more extreme picture of his pain and suffering than what is reflected in the medical records.   Pet. Brief at 6-7; Exhibit 7.   For example, petitioner claims to have experienced pain at a level of 8 to 10 out of 10 during the months following vaccination.   Pet. Brief at 6; Exhibit 7.   However, in the contemporaneously created medical records, petitioner describes much lower levels.   *E.g.,* Exhibit 2 at 122 (estimating his pain as 3 out of 10 at his UCC visit).   Thus, the medical records do not support, and instead contradict, petitioner's claims that he suffered severe levels of pain, described as 8 to 10 out of a level of 10.

---

[19] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

Throughout his injury, petitioner exhibited good ROM in his left shoulder, with pain primarily at the extremes. *E.g.,* Exhibit 2 at 114. Petitioner was benched during most, if not all, of his junior year of high school basketball due to his prior illness, difficulties breathing, and left shoulder injury. However, there is also reliable evidence that he continued to play basketball, whether on his own or at practice, during this time. For example, he reported playing basketball when seen by Dr. Gibson in mid-January 2017. Exhibit 2 at 113. Although instructed by Dr. Gibson not to play until his left shoulder injury resolved, petitioner visited the ED at Mercy Children's on January 25, 2017, with an injury to his thumb sustained while playing basketball. *Id.* at 100 (record regarding injury), 115 (Dr. Gibson's instruction). During a PT session in early April 2017, petitioner again indicated he played basketball the previous day. Exhibit 3 at 85. Although petitioner should not be penalized for continuing this activity, it is evidence that his condition was not so severe as to prevent him from doing so.

The more significant symptom exhibited by petitioner was his lack of strength which was described as reduced by 50% by Dr. Gibson. Exhibit 2 at 114. Throughout the PT records, petitioner's left arm is consistently described as weaker than his right. *E.g.*, Exhibit 3 at 63. However, this weakness was assessed as 4 out of 5 as opposed to normal strength of 5 out of 5. *Id.* at 64. Additionally, the weakness he experienced did not prevent petitioner from engaging in activities such as lifting the photo booth owned and rented by his mother and playing basketball. By late April 2017, petitioner indicated he was able to lift his mother's photo booth without pain on two occasions. *Id.* at 77, 79.

The duration of petitioner's SIRVA was relatively short. By May 2017, it appears that petitioner had recovered almost fully from his left shoulder injury. Exhibit 3 at 93. In his brief, petitioner argues that the information contained in the June 23, 2017 discharge summary from PT at Centerpoint is reflective of his condition at that time. Pet. Brief at 6-7. As previously discussed in this decision, it appears the May 19, 2017 PT session was the last time petitioner was treated for his left shoulder injury. See *supra* Section II. Instead, the discharge summary created on June 23, 2017 seems, as labeled, to be a summary of petitioner's care, providing the full range of symptoms exhibited by petitioner and treatment provided.[20] Exhibit 3 at 98-100.

At his last PT session on May 19, 2017, petitioner reported that he had been free of pain for a week or two and that he experienced no pain prior to or after that session. Exhibit 3 at 93. Although petitioner was treated for other conditions after that date, there is nothing to indicate that his left shoulder symptoms continued. The medical records do not show, and petitioner does not allege, that additional treatment for his left shoulder injury was pursued.

Petitioner alleges, in both his unsigned statement and brief, that he continued to suffer severe levels of pain with movement through Spring 2018, but there is no evidence to support this assertion. Pet. Brief at 7; Exhibit 7. Furthermore, petitioner

---

[20] For example, in the discharge summary, petitioner's range of pain is listed as 0 to 5. Exhibit 3 at 98. These amounts correspond to the full range of pain levels experienced by petitioner throughout his PT. *See generally,* Exhibit 3.

was treated on three occasions during November 2017 through January 2018, for left side pain, congestion, and shortness of breath.  There is no mention of left shoulder symptoms in any of these records.  Exhibit 2 at 3-61.  Thus, the undersigned finds that petitioner's allegations of continued left shoulder pain, weakness, and limited ROM are not supported by the medical records or any other evidence filed in this case.  It appears that petitioner's left shoulder injury resolved by the time he was discharged from PT in June 2017 at approximately seven months.

### B. Comparison to Other SIRVA Awards

Given the evidence provided in this case, it is clear that the severity and duration of petitioner's pain and suffering is most similar to that suffered by the petitioner in *Knauss* and less than that suffered by the petitioners in *Desrosier, Dhanoa,* and *Marino.* In *Dhanoa*, the petitioner suffered pain levels of 5 out of 10, which soon rose to a level 10 out of 10.  *Dhanoa*, 2018 WL 1221922, at *3.  Additionally, the *Dhanoa* petitioner was treated for her SIRVA on and off for a period of three years.  *Id.*, at *4-5.  The amount of damages awarded in the *Desrosier* case was partially based on the unique circumstances suffered by that petitioner which are not present in this case.[21]  The petitioner's in both these cases were awarded $85,000.00 for their actual pain and suffering.

While petitioner's pain and suffering more closely resembles that of the petitioner in *Marino*, who was awarded $75,000.00 for her actual pain and suffering, there are still significant differences.  For example, the petitioner in *Marino* consistently cited higher pain levels than those reported by petitioner in this case.  *Marino*, 2018 WL 2224736, at *7 (describing levels of 5 to 6 out of 10).  Although the evidence showed the *Marino* petitioner's "most intense pain and limiting symptoms lasted for approximately seven months," her pain and limitations continued until more than two years after vaccination. *Id.*, at *8.  In this case, the evidence shows that, by his twelfth and last PT session, six months after vaccination, petitioner was suffering no pain.  Exhibit 3 at 96 (last PT session).

When comparing petitioner's injury to the one suffered by the petitioner in *Knauss,* who was awarded $60,000.00 for his actual pain and suffering, there are factors which would support a lesser award in this case.  However, other factors dictate that the petitioner in this case should receive a greater amount of compensation for his pain and suffering.  Although the petitioner in *Knauss* delayed treatment for several months, he did undergo three months of continuous treatment, which included almost twice the number of PT sessions attended by the petitioner in this case.  *Knauss,* 2018 WL 3432906, at *3 (noting 23 PT session in total).  Additionally, approximately twelve months after vaccination, the *Knauss* petitioner sought further medical care for his shoulder injury which included the administration of a cortisone injection.  *Id.*, at *4.

---

[21] The petitioner in *Desrosier* was pregnant at the time of her vaccination, and thus, unable to avail herself of many treatment options available to others suffering from SIRVAs.  *Desrosiers,* 2017 WL 5507804, at *5.  Therefore, her pain and suffering was greater than it would have been had she not been pregnant at the time.

However, even though mild to moderate, petitioner's pain levels were greater than those experienced by the *Knauss* petitioner. *Knauss,* 2018 WL 3432906, at *2 (citing pain levels of 1 out of 10). Additionally, there was evidence in the *Knauss* case that at least part of petitioner's pain could be attributed to degenerative changes.[22] In the case of this petitioner, a sixteen-year old high school student, the totality of his pain can be attributed to his SIRVA. Moreover, the petitioner in this case suffered significant shoulder weakness. Exhibit 2 at 2 at 114 (Dr. Gibson describing petitioner's strength as 50%). And he experienced the disappointment of being benched during his junior year of basketball, the first time he had made the varsity team. Although petitioner was able to play his senior year, he did miss an entire season which cannot be repeated.

In this case, petitioner had good ROM, mild to moderate levels of pain with movement, and mild to no pain at rest. The strongest medication prescribed to petitioner was Tylenol or Naproxen. Nevertheless, petitioner did exhibit significant weakness throughout his injury. When initially evaluated for PT on March 7, 2017, his injury was described as "moderately severe and moderately irritable." Exhibit 3 at 63. Despite a slight relapse in April 2017, petitioner symptoms gradually improved with PT. Petitioner's shoulder injury resolved after one trip to the UCC, one visit to the orthopedist, and twelve PT sessions from early March to late May 2017. In total, petitioner suffered from his SIRVA injury for approximately six months. During this time, however, he missed his junior year of basketball due to his SIRVA and earlier illness. Reviewing all evidence in this case, the undersigned finds that $70,000.00 is an appropriate award for petitioner's actual pain and suffering.

## VII.   Conclusion

**For all of the reasons discussed above and based on consideration of the record as a whole, the undersigned finds that $70,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.[23]**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $70,000.00 in the form of a check payable to petitioner, Andru Garrett.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[24]

---

[22] The *Knauss* petitioner was treated for shoulder pain prior to receiving the vaccination alleged as causal in that case. *Knauss,* 2018 WL 3432906, at *2.

[23] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Chief Special Master